## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 11 2019, 8:52 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

John G. Forbes, Jr.[1]
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert A. Rowlett
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

---

[1] On April 2, 2019, Appellee Indiana Department of Child Services, by counsel, filed with this court a Notice of Information Regarding Death of Parent's Appellate Counsel, John Forbes, informing this court that Appellant's counsel, John G. Forbes, Jr., died on March 26, 2019.

In the Matter of The Termination of the Parent-Child Relationship of:

A.N. *(Minor Child)*

and

F.N. *(Father)*,

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

July 11, 2019

Court of Appeals Case No. 18A-JT-2147

Appeal from the Marion Superior Court

The Honorable Marilyn Moores, Judge

The Honorable Scott Stowers, Magistrate

Trial Court Cause No. 49D09-1706-JT-596

**Robb, Judge.**

# Case Summary and Issue

[1]     F.N. ("Father") appeals the juvenile court's termination of his parental rights to A.N. ("Child"). The sole issue Father presents on appeal is whether sufficient evidence supported the termination of his parental rights. Concluding that there was sufficient evidence to support the termination, we affirm.

# Facts and Procedural History

[2] Father and S.S. ("Mother")[2] are the biological parents of Child, born on March 20, 2013. On February 26, 2014, Indiana Department of Child Services ("DCS") filed a petition alleging that Child was a child in need of services ("CHINS") because

> [Mother] admitted to ongoing and recent heroin use, and she has not taken necessary action to adequately address her drug problem. In addition, [Father] admitted to marijuana use, and there are concerns that he may be using other drugs as well. [Mother] reported being overwhelmed and is often unavailable to parent [Child] due to arrests or drug use. She also admitted to a history of domestic violence with [Father].

Exhibits, Volume I at 10. Child was removed from the home and was eventually placed in relative care with her maternal aunt and her aunt's husband. Child was adjudicated a CHINS on July 10, 2014, when Mother "admitted to illegal drug use and having a history of domestic violence with [Father]," and Father waived a factfinding hearing. *Id.* at 30.

[3] On August 7, 2014, the juvenile court issued a dispositional decree, inclusive of a parent participation plan, which directed Father to participate in homebased counseling, substance abuse assessment, random drug screens, and domestic violence services. He was also directed to successfully complete a Father

---

[2] Mother executed consents to Child's adoption prior to the termination hearing and does not participate in this appeal.

Engagement Program and refrain from committing any acts of domestic violence.

[4] On June 28, 2017, DCS filed its petition to terminate Father's parental rights. A termination hearing ("TPR hearing") took place on February 7 and July 12, 2018. On August 9, 2018, the court issued its order terminating Father's parental rights, finding in relevant part:

> 7. From Summer 2014 to December 2014, [Father] was pending deportation proceedings and was detained in a Federal Detention Facility.
>
> 8. By May 21, 2015, [Father] was testing positive for alcohol and was not engaged in substance abuse treatment or domestic violence services.
>
> 9. On July 16, 2015, the CHINS Court suspended [Father's] parenting time due to lack of involvement. The Court authorized the reinstatement of [Father's] parenting time upon successful enrollment in Court-ordered services.
>
> 10. As of October 15, 2015, [Father] was still testing positive for alcohol.
>
> 11. At the time of the December 8, 2015 "Permanency Hearing," [Father] had still not engaged in a substance abuse assessment and had not completed substance abuse treatment of [sic] domestic violence assessment.
>
> 12. [Child] had been removed from his [sic] [F]ather's care and custody for at least six (6) months pursuant to the

Dispositional Decree prior to this Termination Action being filed on June 28, 2017.

13. By March 3, 2016, [Father] had completed domestic violence services and Intensive Outpatient treatment although he had stopped submitting to screens in November 2015.

14. At the January 12, 2017 Permanency Hearing, based on non-compliance and positive alcohol screens, the CHINS Court ordered [Father] to be placed on a[n alcohol monitoring system].

15. On or about January 18, 2017, [Father] was placed on [alcohol monitoring].[3]

16. The Track Group tests alcohol consumption via Outreach Smartphone Monitoring ("OSM"). This monitor consists of [Father] being monitored five times per day outside of a nine hour sleep schedule.

17. [Father's] sleep schedule was from 9:00pm to 6:00am [sic]. Thus, the device would contact [Father's] smartphone five times per day and he had thirty (30) minutes to submit to the test.

18. Between January 18, 2017, and February 5, 2008 [sic], [Father] would've had 2,317 "check-in's" with OSM. [Father] missed 993 of these.

---

[3] Father's alcohol monitoring program was administered through a private entity—the Track Group—"a private sector of Marion County Community Corrections." Transcript of Evidence, Volume II at 41. Under the program, Father was required to take random breathalyzer tests five times each day through an application program installed on his smartphone. When prompted by a notification sent to his phone, Father had thirty minutes to complete a test.

19. [C]hild has been placed in relative care with [her maternal aunt and uncle] since February 2014. She is doing well and is bonded with the[m]. This is the only home she has ever known. Her younger biological brother[4] also resides in the home. This is a pre-adoptive placement.

20. [Father] rehabs and manages several rental properties. He spends a significant amount of time on these projects. He is very busy managing these properties.

21. Despite being ordered by the CHINS Court to provide 100% compliance with alcohol screening, [Father] has missed a subtantial [sic] number of screens. Between September 6, 2017 through October 9, 2017, [Father] missed 118 out of 206 alcohol screens.

22. In May 2018, [Father] stopped using the [alcohol monitoring system] because it was "embarrassing."

23. [Father] did submit to alcohol tests at his own expense at United States Drug Testing Labratories [sic] in Greenwood Indiana on February 7, 2018 and July 3, 2018. However, these tests were conducted at times of [Father's] choosing and not randomly thus rendering any results therein to be of dubious value.

24. [Father] has admitted that [Child] is better off with [her maternal aunt and uncle] than she would be with him because of

---

[4] R.N., Child's younger brother, was born to Mother and Father on March 23, 2015, and is not a party to these proceedings. R.N. lives with his maternal aunt and uncle—independent of court involvement.

his work schedule.  He has indicated that he needs "a good woman" to care for his child.

Appellant's Amended Appendix to Brief, Volume II at 18-19.

[5]     Based upon these findings of fact, the juvenile court concluded as follows:

> 25.     There is a reasonable probability that the condition that resulted in [Child's] removal and continued placement outside of the home will not be remedied by [Father].  [Father] has had over four years to demonstrate sobriety and has not done so.  His large number of missed screens cause significant concerns and he stopped alcohol screening due to embarrassment [which] leaves the court with no assurance that he can ensure sobriety.

> 26.     Continuation of the parent-child relationship poses a threat to [Child's] well-being in that it would serve as a barrier to obtaining permanency for her through an adoption when her father is unable to provide permanency and parent.  By his own admission, [Child] is better off with [her maternal aunt and uncle] and [Child's] separation anxiety has improved in recent years.  [Child] has thrived while in the care of [her maternal aunt and uncle] and she has recovered from early developmental delays.  Despite having over four years and completing some services, no provider has been able to recommend unsupervised parenting time between [Child] and [Father].  [Father] chooses not to parent [Child] and has even placed his younger child [R.N.] with [maternal aunt and uncle] independent of Court involvement.

> 27.     Termination of the parent-child relationship is in the best interests of [Child].  Termination would allow her to be adopted into a stable and permanent home where her needs will be safely met.  [Child] is in need of a stable and sober parent.  Although [Father] clearly loves [Child], permanency for [Child] is of

paramount concern and [Father] has been unable to demonstrate sobriety after four years of services.  Most egregiously, he removed his court ordered alcohol monitor due to embarrassment while this Termination Trial was pending.

28.    There exists a satisfactory plan for the future care and treatment of [Child], that being adoption.

29.    The Guardian ad Litem agrees with the permanency plan of adoption as being in [Child's] best interests.

*Id.* at 20.  Accordingly, the trial court determined that DCS had proven the allegations of the petition to terminate parental rights by clear and convincing evidence and therefore terminated Father's parental rights.  Father now appeals.  Additional facts will be provided as necessary.

# Discussion and Decision

## I.  Standard of Review

[6]    Although we acknowledge that the parent-child relationship is "one of the most valued relationships in our culture," we also recognize that "parental interests are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Bester v. Lake Cty. Office of Family & Children,* 839 N.E.2d 143, 147 (Ind. 2005) (internal quotations omitted).  The involuntary termination of one's parental rights is the most extreme sanction a court can impose because termination severs all rights of a parent to his or her children.  *See In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct.

App. 2001), *trans. denied*. As such, termination is intended as a last resort, available only when all other reasonable efforts have failed. *Id*. The purpose of terminating one's parental rights is not to punish the parent, but rather to protect the child. *Id*.

[7] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id*. In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*; *cert. denied*, 534 U.S. 1161 (2002). Thus, if the evidence and inferences support the decision, we must affirm. *Id*.

[8] When, as here, a judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester*, 839 N.E.2d at 147. First, we determine whether the evidence supports the findings, and, second, we determine whether the findings support the judgment. *Id*. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id*.

# II. Statutory Requirements

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008).

For our purposes, to terminate a parent-child relationship, DCS must have alleged and proven the following by clear and convincing evidence:

> (A) that one (1) of the following is true:
>
> > (i) The child has been removed from the parent for at least six (6) months under a dispositional decree[; or]
> >
> > *****
> >
> > (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
>
> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for

placement outside the home of the parents will not be remedied[; or]

*****

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child[;]

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). "[I]f the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship." Ind. Code § 31-35-2-8(a) (emphasis added).

## III.  Sufficiency of the Evidence

[11]  Father first challenges the sufficiency of the evidence supporting the juvenile court's findings as to subsection (b)(2)(B) of the termination statute cited above, that is, remedy of conditions resulting in removal and threat to Child's well-being.  *See* Ind. Code. § 31-35-2-4(b)(2)(B).  He also challenges whether termination was in the best interests of Child.  Initially, we observe that subsection (b)(2)(B) of the termination statute is written in the disjunctive.  Thus, DCS was required to establish only one of the two requirements of the subsection by clear and convincing evidence.  *See L.S.*, 717 N.E.2d at 209.  Nevertheless, the juvenile court determined that both conditions of this

subsection had been satisfied. We, however, need only consider whether sufficient evidence supports the juvenile court's determination that there is a reasonable probability the conditions resulting in Child's removal from Father's care will not be remedied.

## A. Remedy of Conditions Resulting in Removal

[12] Child was removed from Father's care because of his inability to demonstrate sobriety. On appeal, Father argues that he "has shown his commitment to sobriety[,]" and "[t]he fact that a large number of [alcohol] screens were missed does not establish a lack of sobriety." Appellant's Brief at 5. According to Father, he did not intentionally avoid the testing, but instead "found the notification to test very difficult and not informative." *Id.* at 4. Father points this court to his testimony under oath at the TPR hearing and his response of "Nope" when his counsel asked him if he was involved in "anything that would be intoxicating in nature?" *Id.* at 4-5. Father asserts that "[i]f an oath to testify to the truth is meaningless[,] then society in general is at risk." *Id.* at 5.

[13] In deciding whether the conditions that resulted in a child's removal will not be remedied, a juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. It must evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id*. The juvenile court also may consider, as evidence of whether

conditions will be remedied, the services offered to the parent by DCS, and the parent's response to those services. *A.F. v. Marion Cty. Office of Family & Children*, 762 N.E.2d 1244, 1252 (Ind. Ct. App. 2002), *trans. denied*.

[14] A juvenile court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth are permanently impaired before terminating the parent-child relationship. *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). A pattern of unwillingness to deal with parenting problems and to cooperate with counselors and those providing social services, in conjunction with unchanged and unacceptable home conditions, will support a finding that there exists no reasonable probability that the conditions will change. *Matter of D.B.*, 561 N.E.2d 844, 848 (Ind. Ct. App. 1990).

[15] The primary condition leading to Child's removal was Father's inability to demonstrate his sobriety. Father was testing positive for alcohol consumption as of May 21, 2015, and October 15, 2015. He stopped submitting to alcohol screens in November 2015. As of December 8, 2015, he was not engaged in substance abuse assessment and had not completed the substance abuse treatment that was ordered under his parent participation plan.

[16] At the TPR hearing, ongoing family case manager ("FCM") Naomi Boone testified that the only court-ordered service that Father completed was for domestic violence. She further testified that Father was "in a severe state of denial regarding his [alcoholism]." Transcript of Evidence, Volume II at 62.

She explained that while Father completed the intensive outpatient program, he did not complete the recommendations of the program, which included abstaining from alcohol, participating in Alcoholics Anonymous, and obtaining a sponsor. She noted that "[n]ot only did [Father] continue to drink, but . . . he was arrested March 2016 with an OWI and also endangering another person." *Id.* at 63. The guardian ad litem ("GAL") appointed to the case testified that Father promised to provide her with results of his alcohol screenings; however, he did not do so.

[17] Father was placed on a smartphone alcohol monitoring system between January 2017 and February 2018. He should have submitted to 2,317 breathalyzer tests; however, he missed 993 tests. FCM Boone testified that "[e]very missed screen is [considered a] positive [screen]." *Id.* at 71.

[18] Delanne Bruce, the case manager who monitored Father's use of the smartphone alcohol testing application ("app"), testified that when Father obtained a new cell phone, Father deleted the app from his phone and "did not [submit to tests] all week." *Id.* at 43. When Father met with Bruce to have the app reinstalled, Bruce testified that Father made her "uncomfortable" because she felt that he attempted to pressure her to lie about his testing. *Id.* at 44. Bruce explained that "[Father] made me aware that he had a DCS trial and wanted me to know that I needed to be honest with the Judge, and he stated that he does not drink. Um, he just kept repeating that kind of stuff[.]" *Id.* Bruce testified that she told Father she "would not lie under oath. . . . I—in all honesty, I was feeling a little uncomfortable, because I was not at liberty to

discuss his case with him, but um, I just continued to tell him that I was not going to lie under oath and I was going to be honest about his missed test on his OSM or on home monitoring." *Id.*

At the TPR hearing, FCM Boone was asked if she thought the reason that led to Child's removal from Father would be remedied. She stated, "No," and explained: "[Father]'s had 48 months to complete [the court-ordered services], which was more than enough time. And in my professional opinion, and being with the Department of Child Services for 10 years, most parents completed [court-ordered services] within a year to fifteen months." *Id.* at 69.

Given this evidence, we find that DCS proved by clear and convincing evidence that the conditions resulting in Child's removal would not be remedied. Father's arguments to the contrary are a request to reweigh the evidence heard at the TPR hearing, which we will not do. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014).

## B. Best Interests of Child

Father also argues that there was insufficient evidence to support the juvenile court's conclusion that termination of Father's parental rights was in Child's best interests. As set forth above, the juvenile court found that termination of Father's parental rights was in Child's best interests because

> [t]ermination would allow her to be adopted into a stable and
> permanent home where her needs will be safely met. [Child] is
> in need of a stable and sober parent. Although [Father] clearly
> loves [Child], permanency for [Child] is of paramount concern

and [Father] has been unable to demonstrate sobriety after four years of services. Most egregiously, he removed his court ordered alcohol monitor due to embarrassment while this Termination Trial was pending.

Appellant's Amend. App., Vol. II at 20. Father specifically challenges the court's finding that "he has been unable to demonstrate sobriety after four years of services." *Id.*

[22] In determining what is in the best interests of the child, the trial court is required to look beyond the factors identified by DCS and to look to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the child. *Id.* The trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* The testimony of service providers regarding the child's need for permanency supports a finding that termination is in the child's best interests. *Id.*

[23] Here, the juvenile court found that Father "clearly loves his child[.]" Appellant's Amend. App., Vol. II at 20. Testimony was presented at the TPR hearing that during supervised visits, Father and Child "were excited to see each other and happy to see each other[,]" and that "the interaction between them, it is a very loving interaction." Tr., Vol. II at 23, 83. However, considerable evidence was presented regarding Father's inability to demonstrate sobriety, including his failed alcohol tests, his numerous missed alcohol screens,

and his unwillingness to participate in court-ordered alcohol monitoring. FCM Boone testified that "[Father] has been in complete denial of . . . his substance use, of his alcoholism[.]" *Id.* at 64. Father admitted that he missed hundreds of alcohol screens and that he stopped participating in the smartphone alcohol monitoring because he found it "embarrassing." *Id.* at 129. FCM Boone testified that a missed alcohol screen is considered by DCS to be a positive result for alcohol consumption. Case manager Bruce testified that she "[considers a missed alcohol screen] a positive [result for alcohol consumption], because usually people are drinking during that time period. They know when to stop testing." *Id.* at 49. We find that DCS presented sufficient evidence to support the juvenile court's finding that Father was unable to demonstrate his sobriety.

[24] Regarding whether termination of Father's parental rights was in Child's best interests, the FCM answered in the affirmative, explaining that Child should be adopted by her maternal aunt and uncle because "[t]his is all [Child] knows. . . . [I]t is traumatizing . . . to remove her out of her [current] family environment that she's been in more than half her life." *Id.* at 68. The FCM further testified:

> Again, this is the only home [Child] knows, so how much longer— right, so [ages] one through five is— are the most important years developmentally for her. And so, for her to be currently in limbo, and lack the stability, or lack the knowledge of where she's going to go, and this concern. It's very important for her. At what point do we give her permanency[?]

*Id.* at 69.

The GAL also believed that it was in Child's best interests for Father's parental rights to be terminated. In support of this belief, the GAL offered testimony regarding Father's thoughts on Child's current placement with her aunt and uncle and the type of home situation Father indicated he would need to properly care for Child, specifically:

> [Father] has told me that he knows that the placement [Child] is in, it is a good placement, that she is well taken care of, that she has progressed, that . . . she is doing very well there, that there would be no other place that he would have his child uh— er, no one else take care of his child. Um, he has also told me that what he has needed in order to be able to care for [Child] would be, he just needs a good woman um, and that that would help him be able to care for her.

*Id.* at 77. Father's statements regarding needing a "good woman" caused the GAL concern. She explained that "as a parent, [Father] needs to be able to care for [Child] on his own. Um, everybody needs a support, but to say that he just needs a good woman to be able to have his child back in care is very concerning." *Id.*

Regarding Child's placement with her aunt and uncle the GAL testified as follows:

> I don't have any concerns in the home she's in. Um, she has had her own room, the family is very accommodating to [Child]. [Child] does see this as her family. As stated before, she does call um, [her aunt and uncle] uh, mom and dad. Uh, she also sees their son as her brother. Um, she's— she just seems very

comfortable, very well adjusted, very bonded to the family that she is currently placed with.

*Id.* at 80. According to the GAL, "removing [Child] from [her aunt's and uncle's] care would turn her world upside down." *Id.* at 81.

[27] Katie Wilson, a staff therapist, testified that Child is "very well adjusted and very happy" in her aunt's and uncle's home, and that if Child was removed to Father's care, the change would be traumatic for Child and might cause "more tantrums [on Child's part], more confusion . . . , [and] a loss of stability[.]" *Id.* at 56-57. Wilson explained that stability in a child's life, especially in the life of a four year old, is extremely important.

[28] Indeed, Father's own testimony supported the juvenile court's findings regarding termination of Father's parental rights being in Child's best interests. For example, Father admitted to missing a large number of court-required alcohol screens. His excuse for missing the screens was that he was not able to hear or see the notification on his smartphone that prompted him to take the test because he was "busy doing something. Either working or whatever the reason is[.]" *Id.* at 119. Father offered the juvenile court evidence of alcohol screenings that he attended on his own that purported to show that he was not consuming alcohol. However, the court ultimately found the evidence dubious and self-serving. Father admitted that he stopped participating in the smartphone alcohol monitoring despite knowing that the tests were court-ordered. On cross-examination, Father testified that he found it "embarrassing" to have to participate in the smartphone tests. *Id.* at 129.

[29] Moreover, Father repeatedly testified that he believed that Child should remain with her aunt and uncle. When asked by his counsel if he would have Child live with him, Father replied, "to be honest, I really think that she i— [sic] she will be better with uh— on this case, it will be better with uh, [her aunt and uncle]." *Id.* at 108. He testified that if the juvenile court determined that his parental rights should not be terminated, his desire would be for Child to remain with her aunt and uncle because "she's been there for four years, and uh, I think she is in a good home[.]" *Id.* at 109. He further testified that he was "very comfortable" with the aunt and uncle serving as Child's caregivers. *Id.* at 117.[5]

[30] In light of the evidence presented, we find that the juvenile court's conclusion that termination of Father's parental rights was in Child's best interests is supported by clear and convincing evidence.

# Conclusion

[31] Based on the foregoing, we conclude that DCS presented sufficient evidence to support the juvenile's courts termination of Father's parental rights to Child. Accordingly, the juvenile court's termination order is affirmed.

---

[5] At the TPR hearing, Father offered testimony indicating that he wanted Child to remain with maternal aunt and uncle, but that he did not want his parental rights terminated—instead desiring a guardianship arrangement whereby he could visit Child and retain his parental rights. In his Appellant's Brief, Father asserts that the "potential for guardianship was not appropriately considered," however, he does not present a cogent argument on the assertion. Appellant's Br. at 5. We therefore decline to address it. *See* Ind. Appellate Rule 46(A)(8)(a).

[32]    Affirmed.

Baker, J., and Najam, J., concur.